**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL McILMAIL,                   :
                                    :       CIVIL ACTION
          Plaintiff,                :
                                    :       No. 17-cv-2991
     v.                             :
                                    :
COMMONWEALTH OF PENNSYLVANIA,        :
OFFICE OF THE ATTORNEY GENERAL,      :
et al.,                             :
                                    :
          Defendants.               :

**MEMORANDUM**

**Joyner, J.**                                    **May 14, 2019**

Before the Court are Defendants, the Pennsylvania Office of the Attorney General ("PA OAG") and Jonathan Duecker's, Motion for Summary Judgment (Doc. No. 22), Plaintiff Michael McIlmail's Opposition thereto (Doc. No. 30), Defendants' Reply in Support thereof (Doc. No. 31), and Plaintiff's Sur-reply thereto (Doc. No. 34). For the reasons set forth below, we GRANT in part and DENY in part Defendants' Motion.

## I.   Factual Background

This case arises from allegations that the PA OAG and its employee Defendant Duecker, for retaliatory and discriminatory reasons, constructively discharged Plaintiff Michael McIlmail, who, until his departure in November, 2014, held the position of a Narcotics Agent with the Pennsylvania Office of the Attorney General for nearly 20 years. Plaintiff McIlmail brings claims

1

for lack of constitutional due process and for First Amendment retaliation under 42 U.S.C. §1983, as well as claims of discrimination on account of race and religion under Title VII and related statutes.

The following facts are undisputed: From approximately 1996 until November 7, 2014, Plaintiff McIlmail was employed by the Pennsylvania Office of the Attorney General ("PA OAG") as a Narcotics Agent II ("NA II"). Def. Ex. B, McIlmail Depo. at 10. He was permanently assigned to the Organized Crime Unit ("OCU"), which was in the Bureau of Criminal Investigations ("BCI"). Compl. ¶14, Doc. No. 1 (hereafter "Compl."); Def. Stmt. Facts ¶29, Doc. No. 22. Plaintiff's regular work duties as a narcotics agent included "writing reports, making undercover purchases, testifying before the Grand Jury," "interview[ing] informants," and "work[ing] with the FBI" on drug cases. Plaintiff engaged in these duties from October 28, 2013 until March 21, 2014. Compl. ¶¶28, 30.

In October, 2013, Plaintiff's son died of a drug overdose. Id. at ¶24. As a minor, Plaintiff's son had been abused by a Catholic priest. Id. at ¶25. On March 22, 2014, Plaintiff attended a demonstration at a Catholic church in Philadelphia protesting the sexual abuse of children by Catholic priests. Id. at ¶¶31-33. Plaintiff's presence at the protest was made public when his picture was published in a Philadelphia Inquirer

article reporting on the demonstration.  Id. at ¶34.  On March 24, 2014, Plaintiff was told by Charles Crawford, id. at ¶¶120-125, his direct supervisor at the time, that he would be removed from assisting the Child Predator Unit ("CPU") in serving a warrant.  Id. at ¶¶35, 42, 43; Def. Mot. at 6.  After being removed from the scheduled warrant, Plaintiff performed his usual duties as a narcotics agent.  Compl. ¶46.  "No administrators in [Human Resources] ever inquired" into Plaintiff's participation in the protest, and his removal from assisting CPU serving a warrant was "never a part of any internal agency investigation."  Def. Mot. at 6; Def. Ex. B at 16.  Defendant Duecker testified, however, that "sometime after [Plaintiff's] picture was in the paper, it was brought up by someone, not me, [at an executive staff meeting] as a potential issue."  Def. Ex. I at 24-25.

On April 3, 2014, Plaintiff was told by Defendant Duecker that he was being investigated by the Office of Professional Responsibility ("OPR") and that pending the investigation Plaintiff would be "transferred from the [OCU] to the Education and Outreach division [of the PA OAG]," where Plaintiff "would now be working directly for Chief Duecker."  Def. Ex. B at 24-25.  In the same conversation, Defendant Duecker asked Plaintiff to surrender his duty firearm and badge.  Compl. ¶¶46-48, 50,

53.  Plaintiff complied, turning in his gun and credentials. Id. at ¶52; Def. Ex. B at 24-25.

Notedly, while Plaintiff was assigned to administrative duties in the Education and Outreach Unit, his job title remained "Narcotics Agent II."  Pl. Ex. B at 25.  Further, Plaintiff was never terminated nor suspended, and he maintained the same salary and benefits.  Id. at 8-9, 24-25.  Yet, he was no longer eligible for overtime pay as he had been when assigned to duties of a narcotics agent.  Id. at 25.

On December 20, 2013, a complaint from outside the PA OAG, originating from the Bureau of Narcotics Investigations Philadelphia Police Department Task Force Officer, was made against Plaintiff McIlmail and other PA OAG narcotics agents, regarding their alleged mishandling of confidential informants ("CIs") and departure from OAG procedures during drug purchases. Def. Ex. D at 12.  The outside complaint involved Plaintiff's practice, while working as an undercover narcotics agent, of giving unstamped cigarettes, undocumented money, and a license plate to CIs.  Id. at 9, 13.  An OPR investigation followed. The OPR report, dated May 20, 2014, detailed that Plaintiff admitted to "substandard methods of dealing with confidential informants" and it concluded that Plaintiff had violated OAG policy.  Id. at 13-15.

Simultaneously, Plaintiff was also subject to a separate OPR investigation stemming from an outside complaint lodged on April 22, 2014, and received by First Deputy Attorney General ("First Deputy") Adrian King.  Id. at 30.  This complaint indicated "that multiple former and current OAG employees were sending or receiving sexually explicit messages through OAG electronic mail (email)."  Def. Ex. C at 2, 7.  In October, 2014, Plaintiff was notified that he was among the 62 OAG employees, Def. Ex. K at 31, being investigated for possession of inappropriate emails.  Def. Ex. B at 27.

This OPR investigation "determined that NA McIlmail forwarded two emails containing sexually explicit content utilizing his OAG email account" and concluded that Plaintiff had violated the OAG Administrative Policy.  Def. Ex. C at 3, 5.

These were the same claims brought against Plaintiff in a pre-disciplinary ("PDC") hearing.  Plaintiff was notified on October 31, 2014 that a PDC would be held on November 4, 2014, with the purpose of reviewing the allegations against Plaintiff that he violated sections of the OAG's policy for Appropriate Use of Computer Resources and to give Plaintiff an opportunity to explain [his] actions before a final determination was made regarding any disciplinary action.  Ex. E at 3.  The PDC took place November 4, 2014, and both Plaintiff and his union attorney, Lawrence Moran, attended.  Ex. D at 30.  Plaintiff

admitted in his deposition, "I sent inappropriate pictures to other people. . . . I violated policy." Ex. D at 38, 49.

At his November 4th PDC, Plaintiff was asked if he wanted to submit a written statement, and he responded that he would submit one. Ex. D at 35-36. The record shows that a specific disciplinary action had not yet been decided at the time of Plaintiff's PDC, since Human Resources was waiting for Plaintiff to submit his written statement. Nicole Kreiser, Director of Human Resources at the relevant time, testified that she wrote a notation in her personnel committee notes that said, "[Redacted name] + Mc – try to get them to resign," Pl. Ex. C at 9, referring to Plaintiff McIlmail. Def. Ex. K at 35. Yet, she also testified that she did not recall the context of her note, that there was no discussion of firing Plaintiff and that a 10-day suspension for Plaintiff had been contemplated by disciplinary personnel. See Def. Ex. K at 34-37.

At some time before November 7, 2014, Plaintiff learned that other OAG employees had been terminated. Ex. D. Specifically, Plaintiff learned that Tom Sedor (whose termination Plaintiff learned of through his union attorneys) and John Palowski (who Plaintiff saw immediately after he was terminated, with "tears in his eyes"), had been fired. Additionally, he learned that these other employees had

possessed nearly 200 pornographic images on their OAG email.
Def. Ex. D at 50, 51.

Central to Plaintiff's claims, following the November 4, 2014 disciplinary hearing, Plaintiff had conversations with his union attorneys, Lawrence Moran and Melissa Murphy Weber. Id. at 39. Plaintiff testified that Mr. Moran told him by telephone there was a "50 percent chance" that Plaintiff would be fired, because of "political stuff," yet at that point acknowledging "[he didn't] know what's going on here." Id. at 39, 40. On hearing this, Plaintiff attributed his possible termination to his participation in the protest against abuse within the Catholic church, explaining to Mr. Moran, "I can't help but think that this is connected with the church." Id. at 43. Plaintiff testified that Mr. Moran agreed: "Yes, and [the target on your back], it's high up in the church." Id. at 53. Plaintiff further testified that Mr. Moran told him in another phone call that Plaintiff's termination was a certainty: "no ifs, ands or buts, you don't retire, you're getting fired," adding, "you're going to lose everything. You'll lose your medical, everything. . . . I can't help but think 110 percent you got a target on your back." Id. at 41. The following day, according to Plaintiff's testimony, Mr. Moran told him "you absolutely will be fired if you don't retire. You need to retire

if you want your medical benefits and your pension and all."
Id. at 42.

Plaintiff's other attorney, Melissa Murphy Weber, echoed
Mr. Moran's message, telling Plaintiff, "you will be fired today
if you do not resign." Id. at 43. Ms. Weber offered to write a
resignation letter on Plaintiff's behalf. Id.

On November 7, 2014, Plaintiff submitted a written
resignation letter stating,

> Since I have amassed the requisite amount of service time
> to receive retiree health care benefits, as well as a
> vested monthly pension payment. . . .I am pleased to
> announce my retirement from employment with OAG. . .
> .effective today, November 7, 2014. It has been my honor
> and privilege to serve the Commonwealth of Pennsylvania for
> two decades. . .

Def. Ex. A at 2. Notwithstanding this resignation letter,
in the instant litigation, Plaintiff claims that he "did not
retire. I was forced out, constructively discharged." Def. Ex.
B at 6.

On June 30, 2017, Plaintiff filed a Complaint in this
Court. Doc. No. 1. On February 26, 2018, this Court granted in
part and denied in part Defendants' motion for partial
dismissal. Doc. No. 10. Counts I, II, and III of Plaintiff's
Complaint were dismissed to the extent they included claims
against Defendants in their official capacities. Id. at 7. On
December 21, 2018, the parties stipulated to dismiss all claims

against defendants William Ralston and Charles Crawford.  <u>See</u>
Doc. No. 21.

Now the following claims remain at summary judgment:
Counts I and II against Defendant Duecker in his individual
capacity alleging constitutional due process and First Amendment
retaliation under 42 U.S.C. §1983; Counts IV, V, and VIII
against Defendant PA OAG and Defendant Duecker alleging reverse
race discrimination, religious discrimination, and respondeat
superior liability under Title VII and the PHRA; Count VII
against Defendant Duecker in his individual capacity, under
§955(e) of the Pennsylvania Human Relations Act ("PHRA"), for
aiding and abetting the PA OAG in age discrimination; and Count
VI against all Defendants alleging Labor Management Relations
Act ("LMRA") violations related to a lack of process.

## II.  **LEGAL STANDARD**

To obtain summary judgment, a movant must show "that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  Disputes about "material" facts are those that "might
affect the outcome of the suit under the governing law."
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A
"genuine" dispute exists if the non-movant establishes evidence
"such that a reasonable jury could return a verdict" in their
favor.  <u>Id.</u>  "Where the defendant is the moving party, the

burden is on [them] to show that the plaintiff has failed to establish one or more essential elements of her case." Brown v. Aria Health, No. 17-1827, 2019 U.S. Dist. LEXIS 66266 at *9-10 (E.D. Pa. Apr. 17, 2019) (quoting Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013)).  Once the movant meets its initial burden, the nonmoving party must then "go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"The court must review the record 'taken as a whole.'" Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000) (quoting Matsushita, 475 U.S. at 587).  At summary judgment we must view the evidence and draw all inferences "in the light most favorable to the party opposing the motion."  475 U.S. at 587 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  E.g., Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

Still, the non-movant must show more than "[t]he mere existence of a scintilla of evidence in support of [their] position," to defeat a motion for summary judgment. Anderson, 477 U.S. at 252.  To survive summary judgment, the specific facts set forth by the non-movant must require resolution "only by a finder of fact because they may reasonably be resolved in

favor of either party." Id. at 250 (citing First Nat'l Bank v.
Cities Serv. Co., 391 U.S. 253, 288-289 (1968)).

**III. DISCUSSION**

   A. Constructive Discharge

Plaintiff's constructive discharge claim is the basis for
all allegations remaining at summary judgment, except for his
retaliation claim (Count II).  See Compl. Counts I, IV, V, VI,
VII, and VIII.  To support his claim that he was coerced into
resigning from the PA OAG, Plaintiff sets forth evidence of a
series of employment actions that he argues establish that he
was constructively discharged based on racial and religious
discrimination.

Plaintiff alleges that the following employment actions
amount to constructive discharge: First, the first workday after
his picture appeared in the Philadelphia Inquirer showing him
participating in a protest against abuse within the Catholic
church, he was notified by his immediate supervisor, Charles
Crawford, that he was being removed from assisting the CPU in
serving a warrant.  Next, approximately one week after being
removed from assisting with the CPU warrant, he was informed by
Defendant Duecker that he was being investigated by the Office
of Professional Responsibility (OPR) and that pending the
investigation he was reassigned to administrative duty in the
Education and Outreach Unit (where he was ineligible for

overtime pay, Pl. Ex. E ¶18), and that he was required to surrender his duty-fire arm and credentials; Defendant Duecker added that Plaintiff would be "working directly for him, answer[ing] only to him." Def. Ex. B at 24. Plaintiff's reassignment to administrative duty lasted through the time of Plaintiff's departure on November 7, 2014. Pl. Ex. E ¶14. Last, Plaintiff shows evidence that during the days following his pre-disciplinary hearing after an OPR investigation concluded he possessed inappropriate emails, in-house counsel for the PA OAG, attorney Erik Anderson, communicated to Plaintiff's union attorney, Lawrence Moran, that if Plaintiff did not resign he would be terminated. See Pl. Ex. A at ¶5-6.

Defendants present two arguments for why Plaintiff's constructive discharge claim fails. First, Defendants aver there is no evidence that anyone from the PA OAG directly "pressured [Plaintiff] to resign or told him he was going to be terminated other than his own attorney." Def. Mot. at 5. Second, Defendants argue that the question of coercion or threat of termination aside, Plaintiff fails to raise a material dispute as to whether the employment actions preceding his resignation rise to the level of "intolerable work environment such that Plaintiff had no choice but to resign." Id. Instead, Defendants assert, after two separate OPR investigations concluded that he violated OAG policy (first by mishandling CIs,

then by exchanging sexually inappropriate emails using the OAG email system), Plaintiff voluntarily resigned.

The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004). E.g., Mathis v. Christian Heating & Air Conditioning, Inc., 158 F. Supp. 3d 317 (E.D. Pa. 2016); Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984). "Intolerability" is assessed by an objective standard, "whether a 'reasonable person' in the employee's position . . . would have had no choice but to resign." Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Blistein v. St. John's College, 74 F.3d 1459, 1468 (4th Cir. 1996)).

When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge. Suders, 542 U.S. at 142-143. "A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign (internal citation omitted). But he must also show that he actually resigned." Green v. Brennan, 136 S. Ct. 1769, 1776-1777 (2016). See also

13

Seeney v. Elwyn, Inc., 409 F. App'x 570, 573 (3d Cir. 2011)

(quoting Levendos v. Stern Entertainment, Inc., 860 F.2d 1227,

1230 (3d Cir. 1988)) (indicating that where Plaintiff was "not

terminated" by her employer, "to show that her resignation was

an adverse employment action taken by [her employer], she had to

show that she was forced to resign or constructively discharged

under circumstances that give rise to an inference of racial

discrimination.").  Under Green, an employee is not required to

"come forward with proof— proof that would often be difficult to

allege plausibly— that not only was the discrimination so bad

that he had to quit, but also that his quitting was his

employer's plan all along."  136 S. Ct. at 1779.

     "Courts consider a number of factors in determining whether

an employee was forced to resign, including whether (1) she was

threatened with discharge; (2) she was encouraged to resign; (3)

she was demoted or suffered a reduction in pay or benefits; (4)

she was involuntarily transferred to a less desirable position;

(5) her job responsibilities were altered; and (6) she began

receiving unsatisfactory job evaluations.  See Clowes v.

Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993).  See

also Colwell v. Rite Aid Corp., 602 F.3d 495, 502-03 (3d Cir.

2010); Shepherd v. Gannondale, No. 14 Civ. 8, 2014 WL 7338714,

at *15 (W.D. Pa. Dec. 22, 2014) (recognizing a constructive

discharge claim where an "employer acts in a manner so as to

have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns.").

The Third Circuit uses an "objective test in determining whether an employee was constructively discharged from employment: [asking] whether 'the conduct complained of would have the foreseeable result'" of leading a reasonable employee facing that level of difficulty in their working conditions to resign. Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992) (quoting Goss, 747 F.2d at 887-88).

"An employee is protected from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by her co-workers. She is not, however, guaranteed a working environment free of stress." Id. at 1085. See id. (rejecting plaintiff's argument that she was "induced" by her employer into retirement where she "contemplated the offer for some 45 days, and discussed it with her husband, daughters, friends and attorney;" and noting that the record revealed "no suggestion, other than [plaintiff's] own conclusory statements, that the company ever threatened [her] with adverse employment action if she chose not to accept the [retirement] offer.").

In this case, we find a material issue as to whether Plaintiff was threatened with termination or coerced to resign. In Suders v. Easton the Third Circuit considered the "pattern of

conduct [by defendant employer], designed to find some way to terminate [the plaintiff]," to be the kind of "threat" contemplated by Clowes indicative that a constructive discharge occurred. Suders v. Easton, 325 F.3d 432, 446 (3d Cir. 2003). In the context of such a "threat," the Third Circuit emphasized that "even if it is unclear at summary judgment whether a finder of fact would ultimately conclude that [a plaintiff asserting constructive discharge] had no other reasonable alternative but to resign, the claim must be permitted to go forward if plaintiff has "raised genuine issues of material fact relating to her claim of constructive discharge." Id. at 447.

Here, Defendants aver that "no OAG employee ever told [Plaintiff] that he would be terminated," citing Plaintiff's own admission to that effect. Def. Mot. at 17; see Def. Ex. B at 48-49. However, Plaintiff has produced facts establishing a genuine dispute as to what information, if any, was communicated to his union attorney, Lawrence Moran, by the PA OAG's attorney, Erik Anderson. Mr. Moran, who represented Plaintiff in 2014 when he was employed as a Narcotics Agent, testified that "[d]uring the two days between the [pre-disciplinary] hearing of Tuesday, November 4th and Friday, [November 7th], I was in communication with Eri[k] Anderson regarding Mr. McIlmail's possible discipline and that to be imposed on other agents. Mr. Anderson advised me during that period that Mr. McIlmail was all

16

but certain to be terminated as a result of the conduct that was the subject of the November 4th hearing. . . .Mr. Anderson made it clear to me that Mr. McIlmail's best option was to retire, in lieu of being terminated. Based on the representation of [Mr.] Anderson, I relayed to Mr. McIlmail the OAG's position with regard to the likely termination." Pl. Ex. A at ¶¶6-10.

In rebuttal, Mr. Anderson, in-house counsel for the PA OAG at the relevant time, testified that he did not recall whether he had any conversations with Mr. Moran between the completion of Plaintiff's November 4, 2014, PDC, and the submission of Plaintiff's letter of resignation, three days later. Pl. Ex. B at 19-20. Furthermore, he did "not know" if anyone from the PA OAG "conveyed to Mr. Moran information that would give the impression that Mr. McIlmail was going to be terminated." Id. Although he did acknowledge a practice of courteous, informal conversations with union counsel for employees of the OAG, Mr. Anderson did not recall whether that communication would typically take place before or after the PDCs. Id. at 27. Additionally, Director of Human Resources, Nicole Kreiser, testified that she was the author of a personnel committee note stating, "try to get [McIlmail] to resign," Pl. Ex. C at 9, yet could not recall the context in which she wrote the note. Ex. K at 34. At the same time, she testified "the PA OAG had no intention of terminating Plaintiff." Def. Ex. K at 34-37.

Along the same lines, the record reveals a material issue as to whether Plaintiff was coerced to resign. Defendants maintain that Plaintiff's resignation was voluntary, and that the "OAG never imposed any discipline, and therefore, never took any 'adverse action' against Plaintiff for his violation of the OAG policy." Def. Mot. at 16. To this point, Mr. Crawford recalled that Plaintiff McIlmail called him the "night before he left. . . .and told me he'd be leaving the next day. And I asked him if he was sure or if he was being forced into it. And he said it was his decision." Def. Ex. G at 29. See also Def. Ex. I at 93, Duecker Depo. (testifying that notwithstanding having his duty-firearm and badge removed, and being transferred. . ., and reassigned to work for Mr. Duecker, Plaintiff was not demoted and not suspended in any way.").

By contrast, Plaintiff argues that his transfer was discipline. He testified that the requirement that he surrender his duty-firearm and badge "felt like discipline," Def. Ex. B at 25, and was differential treatment since the other OAG employees who were also subject to the OPR investigation for CI mishandling did not have their guns and badges taken away. On the other hand, Nicole Kreiser, Director of Human Resources at the relevant time, testified that there had been "several occasions" where "we have [taken away an agent's badge if they were under an OPR investigation]," Def. Ex. K at 17. Still,

Defendant Duecker conceded that when agents have had their duty-firearm and credentials as a law enforcement officer taken away, it "is something that they're concerned about when they lose it."  Def. Ex. I at 59.

Although "'the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge," <u>Clowes</u>, 991 F.2d at 1162 (quoting <u>Gray</u>, 957 F.2d at 1083 (quoting <u>Bristow v. Daily Press, Inc.</u>, 770 F.2d 1251, 1255 (4th Cir. 1985))), Plaintiff McIlmail has shown evidence of more than his "subjective perception" that he might be terminated if he did not resign.  Therefore, since "[t]he sine qua non of a discharge case is, of course, a discharge," <u>Green</u>, 136 S. Ct. at 1777 (quoting B. Lindemann, P. Grossman, & C. Weirich, Employment Discrimination Law 21-33 (5th ed. 2012), here, where Plaintiff has shown a genuine dispute as to facts that are material to his constructive discharge claim, summary judgment is denied.[1]

---

[1] Defendants argue that pursuant to Fed. R. Civ. P. 26(e) this Court should not consider Mr. Moran's affidavit, in which he testifies that an attorney for the PA OAG communicated to him that Plaintiff would be terminated if he did not resign, because it was not attached to the witness list provided during discovery and was included only in Plaintiff's response in opposition to their motion for summary judgment. However, Defendants will not be prejudiced by our consideration of Plaintiff's attorney's affidavit since they will have an opportunity to rebut Plaintiff's evidence.  <u>See</u> Def. Sur-rep., Doc. 31 at 6, n. 1.

B. <u>Property Interest</u>

In Count I of his Complaint, Plaintiff alleges that he was
deprived of due process under the Fourteenth Amendment. Compl.
¶¶105-108, 112- 114, 116-118. Defendants first argue that
Plaintiff's transfer to administrative duty (while his job title
as a narcotics agent, his salary, and his benefits remained
unchanged) did not deprive him of any constitutionally protected
property interest. Second, Defendants argue that Plaintiff was
provided notice and an opportunity to be heard with regard to
two OPR investigations into his violation of OAG administrative
and computer policies; Defendants aver that these two OPR
investigations were the only source of "discipline" that could
have adversely affected Plaintiff's protected property interest
in his "continued employment" as a narcotics agent.

A plaintiff claiming a procedural due process violation
under 42 U.S.C. §1983 must "allege that (1) he was deprived of
an individual interest. . .encompassed within the Fourteenth
Amendment's protection of 'life, liberty, or property,' and (2)
the procedures available to him did not provide 'due process of
law.'" <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 234 (3d Cir.
2006) (quoting <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir.
2000)).

A constitutionally protected property interest can arise
from a "existing rules or understandings that stem from an

independent source such as state law," Board of Regents v. Roth,
408 U.S. 564, 577 (1972), "or [from a] regulation or arising
from government policy or a mutually explicit understanding
between a government employer and an employee." Carter v.
Philadelphia, 989 F.2d 117 (3d Cir. 1993) (citing Robb v. City
of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984)).  Indeed, the
Supreme Court has noted that "'property' interests subject to
procedural due process protection are not limited by a few
rigid, technical forms.  Rather, 'property' denotes a broad
range of interests that are secured by 'existing rules or
understandings.'"  Perry v. Sindermann, 408 U.S. 593, 92 S. Ct.
2694 (1972) (quoting Roth, 408 U.S. at 577).

     To have a property interest in a government job, a person
"must have more than a unilateral expectation of continued
employment; rather, [he] must have a legitimate entitlement to .
. . continued employment." Hill, 455 F.3d at 234 (quoting
Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005) (citing Roth,
408 U.S. at 577 (1972))).  E.g., Donovan v. Pittston Area Sch.
Dist., 717 F. App'x 121, 123 (3d Cir. 2017).  State law
determines whether the plaintiff has a legitimate entitlement
that gives rise to procedural due process-protected property
interest in a particular government job.  Id. (citing Hill, 455
F.3d at 234 (3d Cir. 2006).  See Carter, 989 F.2d at 121 (ruling
that "[Plaintiff] must show that his alleged property right has

such a basis in state law."). Furthermore, "employment contracts that contain a 'just cause' provision create a property interest in continued employment." <u>Wilson v. MVM, Inc.</u>, 475 F.3d 166, 177 (3d Cir. 2007).

Plaintiff bases his procedural due process claim on the theory that under his collective bargaining agreement ("CBA"), Pl. Ex. G at 35, "while there was no written entitlement to [ ] overtime, it was understood to be a part of the job [of a narcotics agent]." Pl. Opp. at 5. Plaintiff argues that his transfer, which made him ineligible for overtime, should be analyzed along with the additional disputed evidence of communications between attorney Anderson and attorney Moran. In turn, he argues that when viewed collectively, this evidence amounts to a constructive discharge for which he was not provided due process. As we described, <u>see supra</u> Part A, Plaintiff has established facts showing a genuine dispute as to whether he was constructively discharged.

To obtain summary judgment on Plaintiff's procedural due process claim, Defendants' motion addresses each alleged employment action separately, arguing that when viewed piecemeal, Plaintiff either had no protected property interest, or was given proper process. First, Defendants argue that Plaintiff's transfer to administrative duties was a change in the "terms and conditions of employment," <u>Ferraro v. City of</u>

Long Branch, 23 F.3d 803, 806 (3d Cir. 1994), and without

evidence of formal demotion, suspension, or termination, does

not create a property interest in continued employment;

especially here, where Plaintiff's permanent job title

(Narcotics Agent II), salary, and benefits never changed.

Similarly, Defendants aver that the requirement that Plaintiff

turn over his gun and credentials was neither discipline nor a

demotion, and accordingly required no process.  Third,

Defendants assert that the reason for their decision to transfer

Plaintiff to an administrative position and to require him to

surrender his gun and badge was that OPR was investigating him

for alleged mishandling of Confidential Informants ("CIs").  See

Def. Mot. at 10.[2]

From Defendants' angle on the facts, Mr. McIlmail's

transfer to administrative duties was not a "demotion,"[3] so his

receipt of notice of a pending OPR satisfied any process he was

due.  Def. Ex. B 24-25.

---

[2] Notably, however, the record reveals an email from George Moore, a
Human Resources Department staff member, putting forth a different
explanation: "the concern that caused us to take [Plaintiff's] weapon and
credential was that he just lost his son to a drug overdose and that he
may not be mentally stable)[.]"  Def. Ex. H at 3.

[3] We recognize that Donovan noted that the Third Circuit has "held
in similar contexts that a public employee is not deprived of a
constitutionally-protected interest when the employee is not terminated
but instead transferred or assigned different, even less desirable, job
responsibilities."  Donovan v. Pittston Area Sch. Dist., 717 F. App'x 121,
124 (3d Cir. 2017).  We add, however, that the Donovan Court allowed that
it would be possible to "consider [a Plaintiff's] reassignment to be a
'demotion'—notwithstanding the lack of change in her salary or benefits."
717 F. App'x at 125.

However, here Plaintiff has presented evidence of more than a single reassignment.  Compare with Ferraro v. City of Long Branch, 23 F.3d 803, 805-806 (3d Cir. 1994) (finding that a "change in [plaintiff's] work assignment . . . did not rise to a level of wrongdoing constituting a constructive discharge."). The Ferraro Court was wary that "if we considered that a mere change in work assignment deprived an employee of a property interest, as a practical matter we would be federalizing routine employment decisions."  Id. 23 F.3d at 806.  However, where there is a material issue as to whether Defendants' counsel communicated to Plaintiff's counsel, between Plaintiff's PDC and his resignation, that he would be terminated, Plaintiff has established evidence beyond "a mere change in work assignment." Id.  Therefore, Defendants' motion for summary judgment on plaintiff's procedural due process claim is denied.

C. Retaliation for Protected Speech

In Count II of his Complaint, Plaintiff alleged that Mr. Ralston and Mr. Crawford, OAG employees in his chain of command in March, 2014, retaliated against him for participating in the church protest by removing Plaintiff from assisting the Child Predator Unit from serving a warrant.  Compl. ¶¶120-126.  These allegations against Mr. Ralston and Mr. Crawford have been dismissed.  See Stip., Doc. No. 21.

We now turn to the remaining allegation of retaliation for First Amendment-protected speech, under 42 U.S.C. §1983, based on Defendant Duecker's informing Plaintiff that he was reassigned to administrative desk duty and requiring him to turn in his gun and badge, after Plaintiff's picture at the protest was published in the Philadelphia Inquirer and mentioned at an executive meeting that Mr. Duecker attended.  Compl. ¶¶129-130.

A plaintiff claiming retaliation under 42 U.S.C §1983 pursuant to First Amendment-protected speech "must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  "A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate."  Id.

"The second step in the retaliation analysis requires the plaintiff to show that his protected speech was a substantial or motivating factor in an alleged retaliatory action. . . .[T]his step embraces two distinct inquiries: 'did the defendants take

an action adverse to the public employee, and, if so, was the motivation for the action to retaliate against the employee for the protected activity.'" Schneck v. Saucon Valley Sch. Dist., 340 F. Supp. 2d 558, 568 (E.D. Pa. 2004) (quoting Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 800 n.3 (3d Cir. 2000)).

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W., 480 F.3d at 267 (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)).

If the Plaintiff establishes a prima facie retaliation claim, the burden shifts to the defendant employer to articulate "any legitimate reason" for its adverse employment action. Krouse, 126 F.3d at 500 (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)). Then, "if the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. at 500, 501. "The plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect

on the outcome. . . . The burden of proof remains at all times with the plaintiff." Id. (citing Woodson, 109 F.3d at 932.

Here, Defendants do not dispute that "attending the protest against the [C]atholic [C]hurch on the Plaintiff's free-time is protected speech." Def. Mot. at 11. Instead, Defendants argue first, that the reassignment of Plaintiff to administrative duty and the requirement he turn in his gun and badge pending two OPR investigations, were not retaliatory adverse employment actions; and second, that Plaintiff has failed to establish a causal connection between these actions and his protected speech.

The record does not show a material issue as to whether Defendant Duecker's actions were "retaliation sufficient to deter a person of ordinary firmness from exercising his or her rights." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). Indeed, Defendant Duecker testified that he did not decide to reassign Plaintiff or to require Plaintiff to surrender his gun and badge; he merely informed Plaintiff of those changes after someone in Mr. Duecker's chain of command told him "that this was the direction from Harrisburg." Def. Ex. I at 31; Def. Ex. H at 2. Plaintiff has not set forth any evidence that Defendant Duecker's actions (which fell short of demotion, suspension, or termination) were retaliatory.

Next, we find that the record does not show a material issue as to "a causal connection between the protected activity

and the retaliatory action." <u>Lauren W. v. DeFlaminis</u>, 480 F.3d
259, 267 (3d Cir. 2007). Plaintiff points to Defendant
Duecker's testimony that he was present at an executive meeting
at which Plaintiff's attendance at the protest was mentioned:
"it was brought up by someone, not me, in Harrisburg as a
potential issue. I don't remember who brought it up at a staff
meeting. And we could have, you know, peripherally discussed it
at that point. But I don't recall." Def. Ex. I a 24-25.
Corroborating this testimony, Mr. Crawford testified that he
knew no one above him in the chain of command who ever mentioned
they wanted discipline for Plaintiff's participation in the
church demonstration, and that Defendant Duecker never indicated
to him anything about Plaintiff protesting. Def. Ex. G at 45.
Plaintiff also testified that he was "never investigated [by
OPR] for participating in the protest. . . in Philadelphia
regarding the child abuse [by] Catholic priests," and that he
never received notice that his participation in the protest
violated any OAG policy. Def. Ex. B at 13.

Notably, Defendant Duecker eventually advocated for
Plaintiff's return to duties as a narcotics agent– "NA 2
McIlmail has a significant role in an ongoing strategic case and
his transfer to BNI Region 2 is very important." Def. Ex. H at
7. Furthermore, email correspondence indicates that it was not
Defendant Duecker, but Human Resources, who advised that "no

action be taken upon [Plaintiff's request to be transferred out of Education and Outreach] pending HR matters that should be resolved first."  Def. Ex H at 6.

Finally, the investigation into Mr. McIlmail's mishandling of CIs was based on a complaint lodged with OPR three months before Plaintiff was pictured in the newspaper attending a demonstration against sex abuse by Catholic Priests.  Def. Ex. B at 19-20.  See Krouse, 126 F.3d at 503 (holding that "[e]ven if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.").  Compare the three-month interlude here with Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding a causal link between discharge and retaliatory motive justified where "discharge followed rapidly, only two days later, upon [employer]'s receipt of notice of [Plaintiff]'s EEOC claim.").

Thus, in this case, where Plaintiff has failed to produce more than a "mere scintilla" of evidence to support his retaliation claim against Defendant Duecker, summary judgment is granted for Defendants on Count II of Plaintiff's complaint.

D. Discriminatory Discharge

1. Reverse Race Discrimination

In Count IV of his complaint, Plaintiff brings a reverse race discrimination claim against Defendants under Title VII and the Pennsylvania Human Relations Act ("PHRA"). Compl. ¶¶140-145. At summary judgment, Defendants argue first, that Plaintiff was not constructively discharged; second, that he cannot make out a prima facie case of discrimination; and third, that even if he could establish he was constructively discharged, the OPR investigations into his violations of OAG policy provide a legitimate, non-discriminatory explanation.

"Pennsylvania courts have interpreted the PHRA interchangeably with Title VII," therefore the analysis under both statutes is the same. Boles v. City of Philadelphia Water Dept., 2010 WL 2044473 at *1 n.2 (E.D. Pa. 2010). E.g., Mathis v. Christian Heating & Air Conditioning, Inc., 158 F. Supp. 3d 317, 328-329 (E.D. Pa. 2016). Without "direct evidence of racial discrimination," Title VII discrimination claims are analyzed within the McDonnell Douglas "burden shifting framework." Jakimowicz v. City of Philadelphia, 2010 WL 2649890 at *3 (E.D. Pa. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973)). See id. (citing Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999) for the proposition that the burden-shifting test allows claims "where circumstances

are such that common sense and social context suggest that discrimination has occurred," yet without direct proof of it).

A successful discrimination claim under Title VII, requires that "the plaintiff . . . first establish a prima facie case of race discrimination by a preponderance of the evidence.  [To do so] the plaintiff must prove that (1) he is a member of a protected minority; (2) he was qualified for the position in question; (3) despite his qualifications, he suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination." Id. at *3.  If the plaintiff establishes a prima facie case, the burden shifts to defendants to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas Corp., 411 U.S. at 802-03.  Last, the plaintiff has an opportunity to "prove by a preponderance of the evidence that [defendants'] legitimate reasons. . .were. . .pretext for discrimination." Jakimowicz, 2010 WL 2649890 at *3 (quoting Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)).  "[I]n the context of 'reverse discrimination' [plaintiff must only] present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco, 190 F.3d at 161.

Where the alleged discriminatory adverse employment action is a constructive discharge, the Third Circuit has applied the objective test set forth in Goss. "No finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. A plaintiff-employee may prevail on a claim of constructive discharge by establishing that "the conduct complained of would have the *foreseeable* result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." Suders v. Easton, 325 F.3d at 444 (quoting Goss, 747 F.2d at 887-88).

Plaintiff alleges that Defendants Duecker and PA OAG constructively discharged him on account of his race (Caucasian) Compl. ¶¶143-145. To support this claim, he alleges that "prior to his constructive discharge, [he] heard the individual defendant[] [Duecker] make statements that evidenced [his] desire to reduce the number of white male employees in the [PA] OAG and to diversify the office." Id. at ¶¶141, 143.

In rebuttal, Defendants first argue that Plaintiff's prima facie discrimination claim fails because no OAG employees were "treated more favorably." Def. Mot. at 14. See Iadimarco, 190 F.3d at 161. Defendants try to isolate the OPR investigations as the only indicia of allegedly actionable adverse employment actions. But this isolated approach ignores Plaintiff's

argument that the larger context of employment actions contributed to a constructive discharge motivated by race. "The prima facie case method established in McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Id. at 162 (quoting U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711 at 715 (1983)). In this case, Defendants would have us analyze whether Plaintiff McIlmail was "treated less favorably" than other OAG employees by comparing how the Defendants disciplined other employees who were also subject to the OPR investigation into exchanging inappropriate emails on the OAG computer system.

However, where Plaintiff has shown a material dispute as to constructive discharge, a proper comparator analysis would depend on how similarly situated employees were treated after constructive discharge, not after OPR investigations into email use alone. Therefore, we are unpersuaded by Defendants' Iadimarco argument, and we find that the dispute as to whether Plaintiff McIlmail was constructively discharged is material to his discriminatory discharge claim.

Second, Defendants argue that an alleged "stray remark" by Defendant Duecker, if it was made, expressing his intent to "get rid of" "old white guys," Ex. L, is not actionable because Mr.

Duecker was a "non-decision maker," Def. Mot. at 15, "outside of the decision making chain," Walden v. Georgia Pacific Corp., 126 F.3d 506, 521 (3rd Cir. 1997), and therefore he was not acting as an "agent" of the PA OAG. However, we find a material dispute as to whether Mr. Duecker made the comment and to his authority.

First, Defendant Duecker denies ever stating "in the presence of any OAG employees that he wanted to get rid of old white guys." Def. Ex. I at 79-80. Patrick Mangold, an OAG employee in the Gun Violence Task Force during the relevant time testified that he did not recall Defendant Duecker making any statements relating to removing white males from the PA OAG. Pl. Ex. E at 19.[4] On the other hand, Nicole Kreiser testified that she read in the EEO Complaints filed by other OAG employees that "Jonathan Duecker had said he wanted to get rid of the old white guys [at the OAG]." Def. Ex. K at 40. And Plaintiff alleges he heard other employees say Duecker made the comment.

Second, the record reveals a morass of facts that create a material dispute as to Defendant Duecker's disciplinary authority--both as to whether he served as Plaintiff's supervisor and whether he had input into disciplinary decisions. Defendants concede that "OAG narcotics agents fall under the

---

[4] (Mr. Mangold's recollection that Mr. Duecker made comments about removing "old guys and put[ting] younger guys in" was allegedly made in 2016, after Plaintiff left the OAG). See Pl. Ex. E at 21.

Bureau of Narcotics Investigation ("BNI")" Def. Mot. at 15 n. 5.
Defendant Duecker himself testified that Plaintiff McIlmail was
in his chain of command since Plaintiff was a narcotics agent
and Mr. Duecker was "head of [BNI]." Def. Ex. I at 11. Yet,
Defendants argue that since "Plaintiff and three other narcotics
agents were all assigned to the Organized Crime Unit within the
division of BCI," Mr. Duecker was not Plaintiff's supervisor.
Def. Mot. at 15. Plaintiff, on the other hand, testified that
at the time he learned he was transferred, "Jonathan Duecker, .
. . was acting as my supervisor above my two direct supervisors,
William Ralston and Charles Crawford." Pl. Ex. F at 2.
Defendant Duecker himself testified that during Plaintiff's
reassignment "[Plaintiff] would report to me working for BNIDC,
the drug control part, supporting education and outreach." Def.
Ex. I at 93.

Notwithstanding that testimony, the crux of Defendants'
argument is that only the First Deputy Attorney General ("First
Deputy") had authority to terminate an OAG employee. See Def.
Ex. K at 11-12; Def. Ex. I at 15-16. However, the record shows
that OAG employees other than the First Deputy AG, including
Human Resources Director Nicole Kreiser, George Moore (a member
of Kreiser's staff), Def. Ex. K at 8-9, attorney for the PA OAG
Erik Anderson, and, in certain cases, Defendant Duecker, had
input into disciplinary decisions. See Def. Ex. I at 14, Def.

Duecker Depo. (testifying that he did have "input" into disciplinary decisions at the agent level, "if there was an issue with a particular employee. . .whether I was an advocate [f]or him or her or had knowledge that would either mitigate or argue for his termination or discipline for that matter."). And Charles Crawford testified that Mr. Duecker would have had "input into what went on in [the] building [where Mr. Crawford and Mr. McIlmail worked] that had an effect on [him]" because "[Duecker] was a Special Agent in Charge, which was a rank above [Mr. Crawford]." Def. Ex. G at 13. "[Duecker] was in charge of me." Id. at 19. Adding to the confusion in the record over his supervisory authority, Defendant Duecker testified that neither Mr. Crawford nor Mr. Ralston were in his chain of command. Def. Ex. I at 14.

This conflicting testimony raises a genuine dispute as to whether Plaintiff's race factored into an alleged constructive discharge. Accordingly, summary judgment on Count IV is denied.

2. Religious Discrimination

Plaintiff alleges that Defendant Duecker's action of informing Plaintiff that he would be assigned to administrative duties on account of a pending OPR investigation and his request that Plaintiff surrender his duty-firearm and badge was differential treatment as a "result of Plaintiff's religious beliefs and practices," Compl. ¶¶150-151, amounting to

discriminatory constructive discharge.  Defendants concede that Plaintiff is a member of a protected class (Roman Catholic) and was qualified for his position as a Narcotics Agent II."  Def. Mot. at 20.  Yet, Defendants argue that Plaintiff has failed to show an adverse employment action or evidence to support an inference of discrimination.

The McDonnell Douglas burden-shifting analysis applies to Plaintiff's religious discrimination claim under Title VII. Oakley v. Orthopaedic Associates of Allentown, Ltd., 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010).  "Under [Title VII], it is unlawful for an employer to 'discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of . . . religion.'"  Id. (quoting 42 U.S.C. § 2000e-2(a)(1)).  To set forth a prima facie case of religious-based discrimination, Plaintiff must establish he is a "member of a protected class [Roman Catholic]; [he] was qualified to hold [his] position; [he] suffered an adverse employment action; and a similarly situated person outside of the protected class was treated more favorably, or the circumstances of the adverse action give rise to the inference of discrimination."  Id. (citing Jones, 198 F.3d at 411).

As discussed supra, there is a material issue as to whether Plaintiff suffered a constructive discharge, an element of his

prima facie religious discrimination case.  Accordingly, summary judgment on Plaintiff's religious discrimination claim in Count V is denied.

E. LMRA Process

Count VI of Plaintiff's complaint alleges that Defendant PA OAG and Defendant Duecker violated the Labor Management Relations Act (LMRA) Section 301(a), 29 U.S.C. §185(a), by depriving Plaintiff of proper process under his CBA prior to his constructive discharge.[5]  See Compl. ¶¶153-159; Pl. Opp. at 13-14.  Defendants argue that this Court lacks subject matter jurisdiction over the State or its agents, as they are exempted from the definition of "employer" under 29 U.S.C.S. § 152(2).

Under the LMRA, "the term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, . . . or any State or political subdivision thereof. . . ."  Id.  "When acting within the scope of his supervisory authority, a supervisor is [ ] an agent [of an employer]."  Se. Crescent Shipping Co. v. NLRB, 194 F.3d 527, 530 (4th Cir. 1999).  The NLRA defines "supervisor" as "any individual having authority, in the interest of the employer, to

---

[5] As discussed supra, Plaintiff argues that he was constructively discharged based on a series of actions taken by his employer that created objectively "intolerable working conditions," and culminated in Plaintiff being "coerced" to resign.  See Pa. State Police v. Suders, 542 U.S. 129, 124 S. Ct. 2342 (2004).

hire, transfer, suspend, lay off, recall, promote, discharge,
assign, reward, or discipline other employees … [if] the
exercise of such authority is not of a merely routine or
clerical nature, but requires the use of independent judgment."
29 U.S.C. § 152(11). "Thus, to be deemed a statutory
supervisor, an individual must: 1) engage in one or more of the
types of conduct enumerated in section 2(11), and 2) do so "in
the interest of the employer." 194 F.3d at 530 (quoting id.).

The parties do not dispute that Defendant PA OAG is not an
"employer" under the LMRA. See Pl. Opp. at 14. However,
Plaintiff argues that Defendant Duecker remains subject to
liability as a "person acting as an agent of [the PA OAG,] an
employer." 29 U.S.C. §152(2). Not so. The LMRA only applies
to "suits for violation of contracts between an employer and a
labor organization . . . ." 29 U.S.C. §185(a). Therefore, if a
party is neither an "employer" nor a "labor organization," (as
defined by the statute), it cannot be subject to LMRA liability.
As such, Defendant Duecker cannot be sued as "an agent of" an
entity (the PA OAG) that the LMRA exempts from suit. Thus,
summary judgment is granted for Defendants on Count VI.

F. PHRA Aider and Abettor Liability

Plaintiff alleges in Count VII of his Complaint that
Defendant Duecker violated the Pennsylvania Human Relations Act
by aiding and abetting Defendant OAG's discriminatory employment

39

action.  See Pl. Opp. at 14-15.  First, Defendants contend that

Defendant Duecker was not Plaintiff's supervisor, and therefore

not liable for aiding and abetting liability.  Second,

Defendants argue that there was no constructive discharge, so

even if Mr. Duecker is a proper Defendant, Plaintiff's PHRA

claim cannot survive without a requisite "primary violation."

For Plaintiff to establish a primary violation of the PHRA

he must show an "unlawful discriminatory practice."  43 Pa.

Stat. Ann. § 955.  The statute prohibits "any employer because

of [ ] race, color, religious creed. . . to bar or to discharge

from employment such individual . . . or to otherwise

discriminate against such individual. . . with respect to

compensation, hire, tenure, terms, conditions or privileges of

employment or contract, if the individual is the best able and

most competent to perform the services required."  §955(a).  The

statute further protects employees from "any person" found "to

aid, abet, . . . the doing of any act declared. . . to be an

unlawful discriminatory practice."  §955(e).

The PHRA is "generally applied in accordance with Title

VII," which exposes only employers to liability while exempting

individual employees, however, "an individual supervisory

employee can be held liable under an aiding and

abetting/accomplice liability theory pursuant to §955(e) for his

own direct acts of discrimination or for his failure to take

action to prevent further discrimination by an employee under supervision." Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, P.C., 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) (citing Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996) (quoting Joyner, J., Davis v. Sheraton Soc'y Hill Hotel, 907 F. Supp. 896 (E.D. Pa. 1995))). See also Brzozowski v. Pa. Tpk. Comm'n, 165 F. Supp. 3d 251, 263 (E.D. Pa. 2016). An individual employee may be exposed to liability under the aider and abettor provision only if he acts in a supervisory role because "only supervisors can share the discriminatory purpose and intent of the employer. . .required for aiding and abetting.'" Id. (quoting Holocheck v. Luzerne Cty. Head Start, Inc., 385 F. Supp. 2d 491, 497 (M.D. Pa. 2005)).

Even if an individual employee is a supervisor for purposes of aiding and abetting liability under the PHRA, the Plaintiff must show a "primary violation" by the employer. Id. "Individual defendants cannot . . . be liable for violations of [§]955(e) if there is no primary violation of the PHRA." Elmarakaby v. Wyeth Pharm., Inc., No. 09-1784, 2015 U.S. Dist. LEXIS 41300 at *25 (E.D. Pa. Mar. 30, 2015).

So, considering that "[t]he distinction between a supervisor and a co-employee is determinative on the matter of whether a PHRA claim for aiding and abetting discrimination may be brought against an individual defendant," the dispute as to

41

Defendant Duecker's supervisory authority is material.

Brzozowski, 165 F. Supp. 3d at 263.  Additionally, there is a
material issue as to whether Defendant PA OAG committed a
primary violation of the PHRA, i.e., a discriminatory
constructive discharge.  For these reasons, summary judgment on
Plaintiff's PHRA claim is denied.

   G. Respondeat Superior Liability

   Finally, Plaintiff alleges that Defendant PA OAG is liable
through the doctrine of respondeat superior for the actions of
its agent, Defendant Duecker, because as the employer, it
"should have known of the unlawful employment actions being
taken. . . but neither stopped [it] nor acted to prevent it. . .
instead, it ratified the unlawful actions. . .  and took adverse
action . . ." by constructive discharge.  Compl. ¶¶168-170.
Where the constructive discharge and Defendant Duecker's
supervisory status are in dispute, summary judgment on Count
VIII of Plaintiff's Complaint is denied.

**IV.  CONCLUSION**

   For the foregoing reasons, Defendants' Motion for Summary
Judgment is GRANTED in part and DENIED in part.  An appropriate
Order will follow.